SDM CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 171–89C.

United States Claims Court.

March 1, 1990.

David M. Trovato, Andover, Mass., for plaintiff.

Andrew L. Jiranek, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant. Major Nolan Benson, Dept. of the Army, and Kaye Krewer, Rock Island, Ill., of counsel.

## ORDER

MOODY R. TIDWELL, III, Judge:

This action is before the court on defendant's motion for summary judgment pursuant to Rule 56 of the United States Claims Court. Plaintiff seeks to hold defendant liable under the contract for the costs and profits associated with the production of a second set of first article test units because 1) defendant ordered the alleged production or 2) defendant failed to inspect the parts and components of the originally manufactured test units prior to their assembly necessitating the construction of a second set of test units.

## FACTS

On August 30, 1984, the United States Department of the Army awarded contract # DAAA09–84–C–0942 (contract) for the production of specially equipped trailers to serve as survival stations during chemical warfare to SDM Corporation (SDM). The resulting fixed-price contract required the construction of ninety-six M68 Filters, Utilities with Accessories, and final assembly of the survival stations in government furnished trailers. In addition, the assembly of the complete survival station necessitated the use of other government furnished equipment, such as gas engines.

The contract contained explicit first article testing requirements, i.e., an initial delivery of four units of the production quantity of completed survival stations for first article testing. The contract specified that the testing would include government inspection of all sub-assemblies and parts used in the assembled product. The first

article units, therefore, had to be manufactured using the same processes and procedures that would be used in the production of all subsequent units.

The contract, while contemplating final satisfaction of the agreement, nevertheless provided for the failure of first article testing. Upon the request of the Contracting Officer plaintiff could make any necessary changes, modifications or repairs to a disapproved first article or assemble a second first article and submit it for testing. Either of these options were to be exercised at plaintiff's expense. Alternatively, the contract allowed defendant to waive these contractual provisions and obligate the government to pay the additional costs incurred in producing a second first article for testing. Any of the three options chosen obligated plaintiff to bear all costs necessitated by re-testing.

By July of 1985, the parties had modified the contract to provide a time extension for first article testing because of government delays in furnishing government furnished equipment and technical clarifications. By further modification defendant authorized SDM to procure long leadtime items according to a schedule that specified the amount of contract money to be expended on the purchase of these items. Defendant authorized these purchases in order to enable plaintiff to be in a position to be able to meet the future contract delivery schedules.

Between April and May of the following year, defendant inspected the first article units at plaintiff's plant. As a result of this inspection, defendant issued seven Quality Deficiency Reports and, on May 15, 1986, notified plaintiff that the government disapproved and rejected plaintiff's first article units. The rejection was based in the main on plaintiff's inadequate maintenance of contractually required records.

On July 18, 1986, plaintiff notified defendant that it was ready for defendant to re-test the earlier rejected first article units whenever the government found the necessary paperwork satisfactory. In that letter, plaintiff made reference for the first time to the continuation of 100% testing of a second set of first article test units. After receiving this letter, plaintiff met with defendant on August 28, 1986 to clarify the requirements under the contract for retesting the original set of first article units. At this meeting, plaintiff complained that it had not formally offered the original first article units for testing, and, therefore, the government could not reject plaintiff's first article based on the preceding inspections. The senior official at the meeting for defendant, Product Control Manager Warren J. Wolfe, noted the objection. However, Mr. Wolfe only discussed with plaintiff possible options under the contract to correct the problems delineated in the quality deficiency reports. At this meeting, the parties resolved that plaintiff would correct the deficiencies in the original first article units at plaintiff's expense per the terms of the contract and defendant would adjust the testing schedule accordingly.

On September 2, 1986 defendant notified plaintiff that the government was willing to continue first article testing on the first set of first article units if the faults noted in the seven quality deficiency reports had been corrected. On September 10, 1986, the parties again modified the contract to re-establish a delivery schedule. On September 11, plaintiff wrote defendant specifying its corrections to the test units. On February 27, 1987 the government finally approved the first set of first article test units but, on March 23, 1987, terminated the contract for the convenience of the government.

In the resulting termination negotiations, plaintiff sought relief for the building of a second set of first article test units, and alleged that the government had ordered plaintiff to construct a second set. Defendant formally rejected this claim on April 12, 1988 and plaintiff filed suit in this court on March 29, 1989 seeking to recover the costs associated with its work on the second first article units. Thereafter, defendant moved for summary judgment. While this motion was fully briefed and pending before the court, defendant amended its answer to assert counterclaims against plaintiff under RUSCC 15(a) and 13(f). Be-

cause defendant's counterclaim had not been briefed by either party at this time, this decision does not reach the issues raised in defendant's counterclaim.

## DISCUSSION

Summary judgment is appropriate when a court finds that there is no genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir.1987). The court must resolve all significant doubt over factual issues, if any, in favor of the nonmovant and draw all reasonable inferences against the party whose motion is being considered. *Id.* at 1390–91. Defendant has supported its motion with affidavits and other evidence which unopposed would establish its right to judgment. Plaintiff's response did not sit idle and rest upon the general denials in its pleadings or otherwise but proffered rebuttal evidence in its attempt to create a genuine factual dispute. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987) (citations omitted). However, a genuine factual dispute would exist only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant. *Id.*

■ The critical issue disputed in the present action is whether defendant was obligated to pay for the costs and profits associated with producing a second set of first article test units prior to government approval of the original first article. Under the contract, construction or assembly of additional first article or production units prior to first article approval was at the sole risk of plaintiff. The relevant portion of the contract at issue here is the modification of section 1–9 paragraph "h" which reads:

BEFORE FIRST ARTICLE APPROVAL, THE CONTRACTING OFFICER MAY, BY WRITTEN AUTHORIZATION, AUTHORIZE THE CONTRACTOR TO ACQUIRE SPECIFIC MATERIALS OR COMPONENTS OR TO COMMENCE PRODUCTION TO THE EXTENT ESSENTIAL TO MEET THE DELIVERY SCHEDULES. UNTIL FIRST ARTICLE APPROVAL IS GRANTED, ONLY COSTS FOR THE FIRST ARTICLE AND COSTS INCURRED UNDER THIS AUTHORIZATION ARE ALLOCABLE TO THIS CONTRACT FOR (1) PROGRESS PAYMENTS, OR (2) TERMINATION SETTLEMENTS IF THE CONTRACT IS TERMINATED FOR THE CONVENIENCE OF THE GOVERNMENT. IF FIRST ARTICLE TESTS REVEAL DEVIATIONS FROM CONTRACT REQUIREMENTS, THE CONTRACTOR SHALL, AT THE LOCATION DESIGNATED BY THE GOVERNMENT, MAKE THE REQUIRED CHANGES OR REPLACE ALL ITEMS PRODUCED UNDER THIS CONTRACT AT NO CHANGE IN THE CONTRACT PRICE.

Mailgram from Sergeant John B. Pierce, Contracting Officer to SDM Corp. (July 17, 1985). Any costs associated with additional first article production or testing after first article rejection were attributable under the contract to plaintiff. The First Article Approval—Contractor Testing Alternate II paragraph (c) which is derived from Army Procurement Regulation 52.209–3 (APR 1984) reads in relevant part:

If the first article is disapproved, the Contractor, upon Government request, shall repeat any or all first article tests. After each request for additional tests, the Contractor shall make any necessary changes, modifications, or repairs to the first article or select another first article for testing. All costs related to these tests are to be borne by the Contractor, including any and all costs for additional tests following a disapproval.

The plain language of the contract therefore provided that plaintiff bear the risk for any costs incurred as a result of government disapproval of first article unless defendant formally relieved plaintiff of that risk.

### A. Direct Authorization.

Plaintiff argued that it received the required written authority from defendant to purchase long leadtime items identified in the specific amount of $1,065,145.52. This

written authority was reduced to an amendment of the contract. Of necessity, some of the items procured through this authorization would be used in the construction of the first article as the purchase provided materials that would be used in production units out of which the first article was to be produced. Sergeant Pierce's mailgram of July 17, 1985 stated: "THE PURPOSE OF THIS MODIFICATION IS TO: B. AUTHORIZE SDM CORPORATION TO PROCURE LONG LEADTIME ITEMS UNDER CONTRACT DAAA09–84–C–0942 AT A TOTAL VALUE OF $1,065,-145.52 IN ACCORDANCE WITH ENCLOSURE A TO SDM CORPORATION LETTER DATED JUNE 17, 1985." From the plain language of this modification, it is evident that plaintiff's argument that this authorized the construction of a second set of first article test units is unreasonable. *See, e.g., Hol-gar Mfg. Co. v. United States,* 351 F.2d 972, 169 Ct.Cl. 384 (1965) (contract is to be read so as to give meaning to all its terms). Moreover, the government did not reject plaintiff's original first article until May 15, 1986 almost a year after this alleged authorization. Therefore, the specific instructions included in defendant's July, 1985 mailgram authorization cannot be reasonably stretched to include provision for circumstances that neither party could know might occur for at least another six months. No reasonable interpretation of this mailgram, which only authorized the purchase of specified long leadtime items, could conclude that the express authorization required by the contract to construct a second set of first article units at defendant's expense was given. The court therefore holds that plaintiff was not given the necessary written authority to construct a second first article implicitly or explicitly by this mailgram.

*B. Indirect Authorization.*

Plaintiff, however, further argued that Warren Wolfe, defendant's Product Control Manager, implicitly gave plaintiff the necessary authority to build the second first article units at the government's expense. Disregarding for the moment the question whether Wolfe had the authority to bind

the government, plaintiff's own evidence does not support plaintiff's argument. At the May, 1986 meeting between Wolfe, other government representatives, and plaintiff following the government's inspection of plaintiff's first article units, Wolfe merely reiterated what plaintiff already knew, *i.e.,* that plaintiff's options under the contract were to fix the units in a way to satisfy government inquiry or to build new test units for government inspection. Wolfe testified by affidavit that in the later August, 1986 meeting he had with plaintiff, that he further suggested, pursuant to plaintiff's first option, that plaintiff might tear the units apart to allow the necessary government inspection and then reassemble the units, or plaintiff could provide off the shelf units with SDM providing records and test data from its vendors for inspection in addition to the express contract options. Mr. Wolfe stated that plaintiff, rejecting all other options, chose to build first article units.

If plaintiff chose any other course, it has offered no evidence in support of that conclusion. Further, plaintiff's Objection to Defendant's Motion for Summary Judgment states that plaintiff chose to build new test units "[i]n an attempt to save the Government money ..." because "it was more economically feasible to reproduce the first article units rather than disassemble and then ... [rebuild them]." Finally, plaintiff has not offered any evidence that defendant ordered the construction of second first article units. In defendant's letter to SDM confirming the contracting officer's understanding of the meetings between Wolfe and plaintiff, defendant made no mention of its alleged authorization to plaintiff to pay for the building of the second test units. Nor did plaintiff make mention of any authorization in its letters to defendant.

■ Accordingly, plaintiff is left with the argument that Warren Wolfe gave plaintiff an order to build second first article testing units and that Wolfe's express order obligated defendant to pay the costs incurred. The contract language at section 1–9 paragraph h plainly states that only

"THE CONTRACTING OFFICER MAY, BY WRITTEN AUTHORIZATION, AUTHORIZE THE CONTRACTOR ... TO COMMENCE PRODUCTION ..." prior to defendant's approval of plaintiff's first article. The contracting officer was Sergeant John B. Pierce, not Warren Wolfe. Sergeant Pierce swore that "at no time [did he give] written or oral authorization [to plaintiff] to begin construction of a second ... first article ... at Government expense ..." prior to first article approval on February 27, 1987. Plaintiff has produced no evidence to show that Sergeant Pierce acted improperly either by refusing to ratify Mr. Wolfe's alleged order to plaintiff or by refusing to properly consider plaintiff's cost claim for the second first article units. Therefore, the court finds that the agreement between plaintiff and Mr. Wolfe, assuming *arguendo* that it did take place, would not affect the outcome of the suit.[1] *See generally Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Therefore, plaintiff's mere assertion that it received written and/or oral authorization is not enough to bar summary judgment in the present case. *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988).

*C. Contract Performance.*

■ The undisputed facts also showed that first article approval was given by defendant on February 27, 1987 and that the contract thereafter was terminated on May 27, 1987. The terms of the contract contemplated that ultimately all test articles would become production units for delivery to the government under the contract. However, genuine issues of material fact remain as to the legitimacy and impact of plaintiff's claims as claims for production units rather than test units. These material issues of fact prevent the court from completely resolving this case at this time. If the second first article units could have been included in the units to be delivered to the government under the terms of the contract, then compensation for those costs not previously compensated would appear to be appropriate even if those units were initially produced for testing purposes rather than production. Therefore, if these units were actually built, and the government has not compensated plaintiff for them already in the termination settlement or in previous payments, then plaintiff may have a compensable claim under the Contracts Disputes Act, 41 U.S.C. § 605(b) (1982).

CONCLUSION

The court would not be justified in obligating the government to pay plaintiff to build a second first article because Warren Wolfe, as a matter of law, could not have given the requisite authorization to so bind the government. Further, plaintiff offered no reason why the plain language of the contract should not be given its ordinary and natural effect even if Mr. Wolfe's alleged authorization could be construed to bind the government to such liability. · Because the undisputed evidence offered by both parties indicated that Sergeant John Pierce, who did possess the authority to bind the government in this way, did not authorize plaintiff to build second first article units, defendant's motion for summary judgment must be granted.

However, to the extent that the second set of test units can be considered production units under the contract, *i.e.*, as units

---

**1.** To affect the outcome of the suit, plaintiff must have explicitly received authorization from the contracting officer in writing in order that the contracting officer's actual authority to bind the government contractually may be ascertained. *International Business Invs., Inc. v. United States,* 17 Cl.Ct. 122, 124 (1989). Because the sovereign may only be bound to contracts made by those representatives possessing the requisite authority, only an agreement made by such a representative would have any bearing on this suit. *See Miami Metro. Bldg. Corp. v.* *United States,* 180 Ct.Cl. 503, 513–14 (1967) (citations omitted); *International Business,* 17 Cl.Ct. at 124. The plain undisputed facts, therefore, are that only the contracting officer could obligate the government to pay for additional First Article costs, that the contracting officer did not give such authorization, that plaintiff decided on its own following the clear dictates of the contract to build a second First Article with the result that defendant is not liable for those costs under the plain terms of the contract.

both produced before termination of the contract by the government and in existence after first article approval, genuine issues of material fact remain. If these units were in fact produced, then plaintiff might be entitled to compensation for the costs incurred as part of its good faith performance of the contract. Because no evidence has yet been presented to the court as to: 1) the actual construction of these units, 2) the effect, if any, of the termination settlement on these units, or 3) the question whether these units could even be considered as production units as specified by the contract, no action on this matter can be taken by the court at this time. Therefore, defendant's motion for summary judgment is granted in part and denied in part.

The court notes for the parties that the factual issues discussed above appear to the court to be ripe for settlement without further resort to the court. Counsel should explore that possibility before proceeding closer to trial.

IT IS SO ORDERED.